**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name:  14a0403n.06**

**No. 13-1955**


**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

MELISSA FLONES,                                )
                                               )
    **Plaintiff-Appellant,**            )
                                               )
v.                                             )          **ON APPEAL FROM THE**
                                               )          **UNITED STATES DISTRICT**
BEAUMONT HEALTH SYSTEM,                         )          **COURT FOR THE EASTERN**
                                               )          **DISTRICT OF MICHIGAN**
    **Defendant-Appellee.**            )
                                               )
                                               )

**FILED**
Jun 04, 2014
DEBORAH S. HUNT, Clerk

**BEFORE: BOGGS, SILER, and GIBBONS, Circuit Judges.**

    **JULIA SMITH GIBBONS, Circuit Judge.**  This appeal concerns Beaumont Health System's discharge of Melissa Flones on April 6, 2010.  Flones had worked as a nurse anesthetist at Beaumont for more than twenty-six years when, from November 2009 through March 2010, she received three progressively serious plans for performance improvement.  Flones was placed into increasingly severe performance plans after she (1) used her personal cell phone while caring for a patient, (2) set up and began to administer the wrong drug to a patient through an epidural catheter, and (3) ordered and administered a blood transfusion without a doctor's order, all in violation of Beaumont policy.  Between her receipt of the second and third performance plans, Flones complained to Beaumont's human resources department about age discrimination and a hostile work environment.  The third performance plan resulted in her termination.  Flones sued in federal district court, alleging claims of age discrimination and retaliation.  Beaumont moved for summary judgment, which the district court granted.  We affirm.

I.

Beaumont employed Flones as a Certified Registered Nurse Anesthetist (CRNA). Flones worked as a CRNA for more than twenty-six years, beginning in 1983 at Bon Secours Hospital, which was subsequently acquired by Beaumont. As a CRNA, Flones worked under the supervision of an anesthesiologist, who is a medical doctor. At Beaumont, an anesthesiologist is typically responsible for up to four operating rooms, each staffed by a CRNA working under his or her direction. Flones was assigned an operating room, and, for each procedure in that room, she was responsible for checking the anesthesia machine, interviewing the patient, inducing anesthesia, and monitoring, waking, and transporting the patient to the recovery room. Flones performed her responsibilities to the satisfaction of Beaumont until 2009.

On November 30, 2009, Flones received a level-one plan for performance improvement, which found that on August 31, 2009, a patient complained that Flones used her personal cell phone while remaining with the patient in an endoscopy suite. The findings outlined in the level-one performance plan were authored by Mary Golinski, Flones's supervisor and the chief CRNA, and the plan was signed by Flones, Golinski, Judith DeMario, administrative director of surgical services, and Brian Cardeccia, a human resources representative.

On February 1, 2010, Flones received a level-two plan for performance improvement, based on a finding that on January 5, 2010, after the anesthesiologist inserted an epidural catheter into a labor-and-delivery patient, Flones accidentally set up and began the infusion of an antibiotic instead of the correct anesthetic. According to the plan, the attending anesthesiologist asked Flones what anesthetic admixture was being administered, and Flones responded that she did not know. Although the infusion program had begun, the attending anesthesiologist and Flones checked the medicine and identified the error before the patient received the incorrect

drug. Flones was placed into a level-two performance plan and served a one-day suspension. The findings outlined in the level-two performance plan were authored by Golinski, and the plan was signed by Flones, Golinski, DeMario, and Cardeccia. In compliance with the Michigan public health code, which requires the reporting of staff changes, Beaumont reported Flones's suspension to Michigan's Bureau of Health Professions.

Later that month, in February 2010, Flones scheduled a meeting with DeMario and Cardeccia to complain about age discrimination and a hostile work environment. In this meeting, Flones advised DeMario and Cardeccia of several remarks that she interpreted to be ageist, sexist, or hostile. First, Flones advised that Sue Winay, the lead CRNA, told Flones on April 29, 2009, that she was "[s]ick of all you hormonal women, it's time that we got rid of half of you fuckers," and on May 1, 2009, that "[i]f I [Winay] had a nine millimeter, I'd take somebody out." Flones told the human resources representative, Cardeccia, that Golinski was aware that Winay made these comments. Second, Flones stated that in 2008, Golinski asked her if she were too old to work sixteen-hour shifts. Flones replied that she had not worked a sixteen-hour shift in nine months, to which Golinski responded, "Melissa, you're not listening to me." A few days later, Flones asked Golinski to clarify her remark, to which Golinski again replied that Flones was not listening to her. Third, Flones advised that a co-worker, Eric Reim, said that he heard anesthesiologists mention that Golinski intended to fire Flones along with another co-worker, Ed Gaspar. Lastly, Flones advised that another co-worker, Earl Auty, had made a comment about "hard bodies" working at Beaumont's Troy Hospital.

After the meeting, human resources investigated Flones's complaints. Cardeccia directed DeMario to speak with Golinski and Winay to confirm the statements Flones alleged each had made. DeMario informed Golinski that Flones complained to Cardeccia. Golinski, however,

averred in her deposition that DeMario only mentioned Flones's complaint that Reim said Golinski intended to fire Flones. Golisnki stated that she did not remember DeMario mentioning Flones's complaint that Golinski herself had made allegedly ageist comments. Golinski also represented that although she heard second-hand that Winay made the threatening comments, she did not directly hear Winay "saying those words." When DeMario confronted Winay, Winay had no recollection of making the alleged ageist and hostile statements. But Cardeccia noted that Winay had a habit of making threatening comments. Cardeccia also suggested that Flones speak with Reim. According to Flones, Reim confirmed that he had heard that Golinski intended to fire Flones. But according to Golinski, Flones said Reim denied that he had overheard that Golinski intended to fire Flones.

On May 18, 2010, Flones received a level-three plan for performance improvement, which resulted in her termination. The plan found that on March 29, 2010, while Flones monitored a patient undergoing a total hip replacement performed by Dr. Paul Schreck, she unilaterally made the decision to administer "blood products (packed red cells) without consultation or collaboration or order from the surgeon or from the medically directing anesthesiologist of record." According to Beaumont surgical-services operating-room policy, "[b]lood transfusions will be administered in the operating room upon the order of a physician." According to Beaumont's nursing education policy, "[b]lood products are administered only upon the explicit order of a licensed physician." The level-three plan noted that Flones "expressed that she was unaware of the requirement to collaborate with the medically directing anesthesiologist and/or surgeon prior to administering blood products." Flones testified that when she administered blood to the patient she had no order to do so from either of the physicians in the operating room. The plan contained a finding that "the surgeon and

anesthesiologist did not believe that blood was indicated and would not have ordered the packed cells for transfusion" and "expressed great concern regarding [the] risk posed to the patient because [Flones] acted outside her scope of practice." Indeed, the attending surgeon, Schreck, spoke with Flones after the incident and confirmed that Flones had made the decision independently. Emphatic that he should be involved "in important care decisions for the patient that have ramifications," Schreck brought the incident to the attention of Myrtice Macon, the attending anesthesiologist, DeMario, and "just about everybody in the operating room in a position of supervision." Schreck pressed the issue in meetings subsequent to the procedure. Schreck did not recall whether he spoke with Golinski about his concerns. Macon, however, spoke with Golinski about the incident "within a few days of the case." The level-three plan concluded that Flones "has not shown improvement related to quality care provided to her patients or in following established policies" and "has demonstrated serious practice issues that include deficiencies in safe and accepted practices and lack of awareness related to the limitations of her scope of practice." The plan was signed by Golinski, DeMario, and a representative from human resources. Flones's position at Beaumont was terminated effective April 6, 2010.

Flones grieved her termination before Beaumont's Grievance Council. The Council found that Flones "acted outside the scope of [her] license by ordering and administering a blood product without an order from a licensed physician" and upheld the termination.

In compliance with the Michigan public health code, Beaumont reported Flones's termination to Michigan's Bureau of Health Professions. On May 10, 2011, the Bureau of Health Professions filed an administrative complaint against Flones, alleging that her unauthorized administration of blood products amounted to negligence and practice outside the

scope of a license, in violation of Michigan's public health code. The state interviewed Flones, and during this interview Flones stated that although Schreck did not issue a verbal or written order for a blood transfusion, he was aware that she had ordered the blood product during the hip replacement procedure. Kathleen Lavery, a member of the Michigan Board of Nursing, reviewed Beaumont's complaint and the information provided by Flones and determined that Flones "provided appropriate care to the patient and used good judgment in the matter." Lavery supported dismissal of the complaint. After review, the disciplinary subcommittee dismissed the complaint.

Following her termination, Flones filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, respectively. She received a right-to-sue letter and filed this lawsuit on October 6, 2011. After discovery, Beaumont moved for summary judgment, which the district court granted. *See Flones v. Beaumont Health Sys.*, No. 11-14416, 2013 WL 2898213, at *1 (E.D. Mich. June 13, 2013).

The district court found that Flones presented no direct evidence of age discrimination. *Id.* at *4. Employing the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), the district court found that Flones did not attempt to make out a *prima facie* case of discrimination, *Flones*, 2013 WL 2898213, at *5, and held, even assuming *arguendo* that she could make out a *prima facie* case, that Flones could not show that Beaumont's proffered reasons for her termination were pretextual, *id.* at *5−*6.

The district court also found that Flones presented no direct evidence of retaliation. *Id.* at *6. The district court noted that to establish a *prima facie* case of retaliation, Flones needed to

adduce some evidence indicative of a causal connection between the retaliatory action and the protected activity. *Id.* at *7 (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). The district court found that because Flones only pointed to the temporal proximity between her complaint of age discrimination and her termination, she failed to establish a *prima facie* case. *Id.* at *7−*8. The district court went on to say that even if Flones made out a *prima facie* case, she could not demonstrate that Beaumont's proffered legitimate reasons for her termination were pretextual. *Id.* at *8. Flones timely appealed.

## II.

We review the district court's decision to grant summary judgment *de novo. Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). Summary judgment is appropriate if "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson*, 477 U.S. at 248. The party moving for summary judgment bears the initial burden of production under Rule 56. *Lubrizol Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 200 F. App'x 555, 559 (6th Cir. 2006). The burden may be satisfied by presenting affirmative evidence that negates an element of the nonmovant's claim or by demonstrating "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this

burden, the nonmovant must respond "'by affidavits or as otherwise provided in Fed. R. Civ. P. 56'" and "'must set forth specific facts showing that there is a genuine issue for trial.'" *Lubrizol*, 200 F. App'x at 559 (quoting Fed. R. Civ. P. 56(e)). To avoid summary judgment, the nonmovant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). However, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion" for summary judgment. *Anderson*, 477 U.S. at 247–48.

## A.

The ADEA forbids an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The purpose of the ADEA is "to protect older workers from being 'deprived of employment on the basis of inaccurate and stigmatizing stereotypes' and to ensure that employers evaluate their employees on the basis of their merits and not their age." *Allen v. Diebold, Inc.*, 33 F.3d 674, 676−77 (6th Cir. 1994) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). "[U]nder § 623(a)(1), the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).

"A plaintiff 'may establish a violation of the ADEA by either direct or circumstantial evidence.'" *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009)). "'Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Geiger*, 579 F.3d at 620 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). "Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination." *Id.* at 620−21 (citing *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004)). Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, do not suffice to satisfy the plaintiff's burden to demonstrate animus. *Id.* at 621.

Flones has not presented direct evidence of age discrimination. There is no evidence to suggest that the statements allegedly made by Auty, Reim, or Winay were related to the process to terminate Flones. Nor is there evidence to suggest that Auty, Reim, or Winay were involved in that decision. Their statements are not evidence of age discrimination. *See id.* Flones adduces two alleged statements of Golinski, who was involved in the termination decision. First, Flones points to Golinski's inquiry into whether Flones was too old to work sixteen-hour shifts when Flones no longer worked those long shifts. Second, Flones adverts to Reim's statement that he heard an anesthesiologist say that Golinski expressed the intent to fire Flones and Gaspar. The second statement is inadmissible hearsay,[1] and it is well established that a court may not consider inadmissible hearsay when deciding a summary-judgment motion. *See, e.g.*, *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("'[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence . . . must be disregarded.'"

---

[1] Indeed, it is hearsay within hearsay.

(quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997))).

That leaves the former statement—Golinski's alleged inquiry into Flones's ability to work sixteen-hour shifts. This statement, if believed, does not compel the conclusion that age discrimination was a motivating factor in Flones's termination because it was a mere inquiry. Therefore, Flones presents no direct evidence of age discrimination.

Where "the plaintiff fails to present direct evidence of age discrimination, the claim is analyzed using the burden-shifting framework of *McDonnell Douglas*." *Blizzard*, 698 F.3d at 283; *see also Geiger*, 579 F.3d at 622 (finding that the *McDonnell Douglas* framework applies to ADEA claims based on circumstantial evidence even after *Gross*'s rejection of the burden-shifting framework for claims of direct evidence). "Under *McDonnell Douglas* and its progeny, once the plaintiff succeeds in making out a prima facie case of age discrimination, the defendant must 'articulate some legitimate, nondiscriminatory reason' for the termination." *Blizzard*, 698 F.3d at 283 (quoting *McDonnell Douglas*, 411 U.S. at 802). "'If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext.'" *Id.* (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003)). To establish a *prima facie* case of age discrimination, Flones must show: "'(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'" *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)).

On appeal, Flones argues that Golinski's comments regarding her ability to work sixteen-hour shifts and Reim's statement about Golinski's intent to discharge two of the oldest CRNAs are sufficient to demonstrate a *prima facie* case of age discrimination. Again, consideration of the latter statement is precluded by its inadmissibility. The former comments include Golinski's

inquiry as to whether Flones was too old to work sixteen-hour shifts, nine months after Flones ceased working such shifts, and, upon Flones's requests for clarification, Golinski's opaque statements that Flones was not listening to her. Assuming *arguendo* that these statements amount to a *prima facie* case of age discrimination, Flones cannot demonstrate that Beaumont's proffered, legitimate reasons for her termination were pretextual.

A plaintiff can establish pretext "by proving '(1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate [her discharge], or (3) that they were *insufficient* to motivate discharge.'" *Id.* at 285 (alteration in original) (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)). "The first category implicates evidence 'that the proffered bases for the plaintiff's discharge never happened,' and the second category requires that the plaintiff 'admit[] the factual basis underlying the employer's proffered explanation and further admit[] that such conduct could motivate dismissal.'" *Chattman*, 686 F.3d at 349 (alteration in original) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "The third category of pretext consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." *Id.* (citing *Manzer*, 29 F.3d at 1084). "A showing of the third type of pretext is a direct attack on the credibility of the employer's proffered motivation for disciplining the plaintiff and, if shown, 'permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case.'" *Id.* (quoting *Manzer*, 29 F.3d at 1084). "In other words, it creates a genuine, triable issue of material fact." *Id.*

Beaumont proffered several legitimate, nondiscriminatory reasons for Flones's termination: the level-one performance plan for her use of a personal cell phone while caring for a patient, the level-two plan for her set up and administration of an antibiotic instead of an anesthetic into a patient's epidural catheter, and the level-three plan for her unapproved order of a blood transfusion during a hip replacement procedure, which precipitated her discharge.

On appeal, Flones suggests that there are genuine issues regarding whether Beaumont's proffered reasons had no basis in fact. There are not. With respect to the level-one performance plan, Flones conceded in her deposition testimony that she used her phone to research a medical question for a friend, which was not related to the patient for whom she was caring. She also said she was aware of the rule against using personal phones to conduct personal business and admitted to using her phone while caring for a patient.

With respect to the level-three performance plan, Flones contends on appeal that she in fact had authorization to order the blood transfusion without an explicit order from the surgeon or anesthesiologist. Flones proffers the transfusion record to prove that she was authorized to order blood under a physician's order. This exhibit shows that Enjoli Kendell, a registered nurse who was present during the hip-replacement procedure and received the blood products during the surgery, verified a physician's order for the blood transfusion. Given the transfusion record, Kendell apparently believed that a doctor ordered the blood products. Flones also adduced the deposition testimony of Theodore Repp, a registered nurse at Beaumont who works as a circulator for blood transfusions, to show a genuine issue regarding whether Flones had Schreck's authorization to initiate a blood transfusion. But Kendell's belief that a physician ordered a blood transfusion, and Repp's testimony that Schreck would ordinarily have known about Flones's call for blood, is contradicted by Flones's own deposition testimony that she

ordered blood without a specific order from either of the physicians in the operating room. Furthermore, according to Schreck, he did not order blood or authorize Flones to order blood. Assuming there is a genuine issue regarding whether Schreck authorized or acquiesced in the transfusion, this issue does not create a genuine issue of fact regarding whether Beaumont's proffered reasons for her discharge had no basis in fact. There is no evidence in the record suggesting that Beaumont decision-makers had reason to believe anything other than that Flones's action was unauthorized.

Flones next argues that there is a genuine issue as to whether the proffered reasons were insufficient to motivate her dismissal. She submits that her administration of the wrong medication was insufficient to motivate Beaumont's imposition of a level-two performance plan. Flones contends that she should have received a level-one plan for the medication error because she never should have received a level-one plan for the personal cell phone use, which, according to her, was undeserved, meriting only counseling, and was disproportionate to the discipline other CRNAs received for similar violations, being motivated by a discriminatory animus. Beaumont responds that Flones produced no evidence to show that it was contrary to Beaumont policy or otherwise unreasonable for Beaumont to place her into a level-two plan for administering the incorrect medication to a patient.

Flones also suggests that her unauthorized order and administration of a blood transfusion to a patient were insufficient to motivate her discharge. First, Flones states that Schreck never complained that Flones's action was outside the standard of care and never filed a complaint. Even so, Schreck was concerned about Flones's action and spoke with Macon, DeMario, and "just about everybody in the operating room in a position of supervision." Moreover, the decision to discharge Flones was a nursing decision, not a doctor's decision. Schreck's failure to

speak to Flones or to file a complaint against her does not raise a question as to whether Beaumont's reasons for dismissing her were pretextual.

Second, Flones argues that her unauthorized administration of blood products was not a breach of Beaumont policy. In support of that contention, Flones offers the affidavit of Richard Schroeder, who formrely worked as a CRNA at Beaumont. Schroeder attests that a CRNA, upon recognizing the need for blood, announces the need and commissions the order, not always with a response or approval from the surgeon beforehand. Since Schroeder did not work at Beaumont at the time of his affidavit, his views as to Beaumont policy are largely irrelevant. Moreover, record evidence clearly shows that under Beaumont's operating-room policy and nursing-education policy, CRNAs may not order blood products absent a physician's order. Schroeder's affidavit that he occasionally acted outside of this policy does not show that Flones's unauthorized administration of a blood product to a patient was insufficient to impose the level-three performance plan.

Third, Flones adduces the state investigation, which found "Flones provided appropriate care to the patient and used good judgment in the matter . . . [and] the alleged violations of the Public Health Code cannot be substantiated." But the results of the state investigation do not suggest that Flones did not violate Beaumont policy (which she admittedly did), and therefore they do not suggest that Beaumont did not dismiss her for that reason.

Given the evidence that Flones adduces, a reasonable jury could not find that Beaumont's proffered reasons were not based in fact or were insufficient to motivate her discharge. Flones cannot establish a genuine issue as to pretext, she cannot establish that age was the but-for cause of her dismissal, and she cannot successfully prove an age-discrimination claim. *See Gross*, 557 U.S. at 177.

B.

Title VII proscribes retaliation against an applicant for making charges opposing unlawful discriminatory employment practices. *See* 42 U.S.C. § 2000e−3(a). A plaintiff may establish retaliation by introducing direct evidence or through the use of circumstantial evidence. *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). Flones does not present direct evidence of retaliation. When based on circumstantial evidence, a retaliation claim is evaluated using the burden-shifting analysis described in *McDonnell Douglas*. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (citing *McDonnell Douglas*, 411 U.S. at 801−05). Under this framework, the burden first falls on Flones, who must establish a *prima facie* case of retaliation by showing that: (1) she engaged in protected activity, (2) Beaumont knew of the exercise of the protected right, (3) Beaumont subsequently took adverse employment action against her, and (4) there was a causal connection between the protected activity and the adverse employment action. *See id.* Once Flones demonstrates a *prima facie* case, the burden shifts to Beaumont "'to produce evidence of a legitimate, nondiscriminatory reason for its actions.'" *Id.* (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)). If Beaumont meets this burden, Flones bears the burden of demonstrating that the proffered legitimate reason is pretextual. *Id.* (citing *Niswander*, 529 F.3d at 720).

To establish the causal connection required for a *prima facie* case, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citing *Avery*, 104 F.3d at 861). Evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.

*Id*. (citing *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987)). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Id.* (citing *Avery*, 104 F.3d at 861).

Flones argues that the district court erred in holding that she could not demonstrate a *prima face* case because she failed to establish a causal connection between her February 2010 complaints to Cardeccia and DeMario about both age discrimination and a hostile work environment and her April 6, 2010, termination. Flones adduces scant evidence to establish a causal connection between her protected activity and discharge. First, she cites the temporal proximity between the two events—less than two months elapsed between her complaint and discharge. But on this record this interval is insufficient to support a *prima facie* inference of causation. "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

Burdened to adduce other evidence of retaliatory conduct to establish causation, Flones submits three facts: Golinski's failure to speak with Kendell and others present in the operating room before terminating her position; Golinski's failure to present to the grievance panel that the blood circulator had signed a form indicating that Schreck ordered the blood transfusion; and Schreck's testimony that he did not think Flones should have been terminated. But these facts do not support an inference of causation. First, the attending doctors, Schreck and Macon, were not party to the decision to dismiss Flones. Second, Golinski's failure to speak with Kendell and others in the operating room before Flones's discharge does not support an inference that retaliation was the cause. The proximate cause of Flones's dismissal was Schreck's and

Macon's statements to the nursing staff regarding the risk posed to the patient because of Flones's unauthorized administration of blood products. Schreck expressed his concern to Macon, DeMario, and others with supervisory positions in the operating room. He pressed the issue in later meetings. Macon expressed his concerns to Golinski. Further, Flones conceded that she has no evidence to suggest that either Schreck or Macon knew about her complaint to Cardeccia and DeMario. And the record suggests that the attending doctors had no knowledge of Flones's protected activity.

Lastly, Golinski's failure to present to the grievance panel that the blood circulator had signed a form indicating that Schreck ordered the blood transfusion does not support an inference that Flones's dismissal was retaliatory. Despite Flones's suggestion, Golinski's omission does not suggest that she was concealing from the Grievance Council the reason motivating Flones's discharge. Rather, Macon informed Golinski of his and Schreck's concerns that Flones ordered and administered blood without a doctor's authorization, and Flones's level-three performance plan reflects that concern. Flones has not produced any evidence that her activities were more highly scrutinized after her protected activity or that she was treated differently from similarly situated employees. *Cf. Nguyen*, 229 F.3d at 563. Her dismissal was initiated by doctors who were concerned with her operating-room error and who did not know of her complaint of age discrimination. The record does not support an inference of retaliation.

Even assuming *arguendo* that the record does *prima facie* support such an inference, for the reasons presented above, Flones cannot show that Beaumont's proffered, legitimate reasons for her dismissal were pretextual.

III.

For the foregoing reasons, we affirm the district court's grant of summary judgment.